**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:

JOANNE NELSON, Derivatively on Behalf of
CHIPOTLE MEXICAN GRILL, INC.,

Plaintiff,

    v.

STEVE ELLS,
MONTGOMERY F. MORAN,
JOHN R. HARTUNG,
ALBERT S. BALDOCCHI,
JOHN S. CHARLESWORTH,
NEIL W. FLANZRAICH,
PATRICK J. FLYNN, and
DARLENE J. FRIEDMAN,

Defendants,

   - and -

CHIPOTLE MEXICAN GRILL, INC., a Delaware corporation,

Nominal Defendant.

---

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

---

Plaintiff Joanne Nelson ("Plaintiff"), by her undersigned attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") on behalf of nominal defendant Chipotle Mexican Grill, Inc. ("Chipotle" or the "Company") against the defendants named herein. Plaintiff alleges upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief based upon her attorneys' investigation, which included, but was not limited to, a review of United States Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available information regarding the Company, as follows:

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought for the benefit of nominal defendant Chipotle against certain members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties.

2.      Chipotle, which went public in 2006, has been known for its rapid growth and high stock valuation.  Chipotle operates restaurants throughout the United States, as well as in Canada, the United Kingdom, and France.  Chipotle restaurants serve a focused menu of burritos, tacos, burrito bowls (a burrito in a bowl without the tortilla) and salads, made using fresh ingredients.

3.      As a large, publicly traded employer, Chipotle's business and operations are subject to the requirements of the U.S. immigration and securities laws.  Moreover, as Chipotle's corporate fiduciaries, defendants owed Chipotle and its shareholders a fiduciary duty of loyalty and care to cause the Company to comply with these well-known federal laws and their related rules and regulations.

4.      Nevertheless, despite a known legal duty to act, i.e., to cause Chipotle to comply with federal immigration and securities laws, defendants had a systemic problem that caused Chipotle to engage in myriad of employee hiring practices that violated federal immigration laws.   In fact, an investigation into Chipotle's hiring practices in Minnesota by the U.S. Immigration and Customs Enforcement ("ICE") unit of the U.S. Department of Homeland Security uncovered that a large number of employees lacked (or could not provide) valid work eligibility documents, resulting in the firing of 450 employees.   A similar ICE investigation in Virginia and Washington D.C. resulted in an additional fifty firings.   The Company also is under investigation by the U.S. Attorney for the District of Columbia and the SEC for possible criminal and/or civil violations of the federal immigration.

5.      Moreover, due to defendants' disdain for legal compliance, between at least February 1, 2012 and the present, defendants caused or permitted the Company to make false and misleading statements about the demand for Chipotle's products and the strength of its business, thereby exposing Chipotle to violations of the federal securities laws.   In fact, the Company has already been named as a defendant in a costly and expensive to defend class action lawsuit for violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

6.      Chipotle consistently highlights its "Food With Integrity" approach.   According to Chipotle, what this means is the Company finds the highest quality ingredients it can resulting in ingredients that are grown or raised with respect for the environment, animals, and people who grow or raise the food.   As such, the Company pays more than its peers for its higher-quality ingredients and prices its food at a premium.

7.    The defendants deceived shareholders with proclamations of the Company's financial health, pointing to, amongst other things, its superior pricing power because its customers were willing to pay a premium for Chipotle's food due to the Company's dedication to using high quality and fresh ingredients.  In truth, however, the defendants knew that the demand for its products and customer traffic at its stores was slowing and could not support the Company's earnings forecasts.

8.    In addition, defendants' improper statements artificially inflated Chipotle's stock price.  While the stock was artificially inflated, and on the basis of the material, non-public information concerning the Company's true business health that they possessed, the Insider Selling Defendants (as defined herein) sold over $26.9 million worth of their personally held stock.

9.    Plaintiff brings this shareholder derivative action to remedy the Individual Defendants' (defined herein) breaches of fiduciary duties in connection with the issuance of false and misleading statements concerning the Company's earnings and business prospects. Specifically, during the time complained of the Individual Defendants knew but failed to disclose that: (i) Chipotle did not have the pricing power to implement price increases sufficient to offset rising food costs and, as a result, the Company's margins would be under pressure as Chipotle would be unable to pass these commodities costs off to the customers; (ii) demand for Chipotle was slow and could not support the Individual Defendants' aggressive 2012 earnings forecasts, particularly that customer traffic at Chipotle stores had begun to slow due to the economy and increased competition; and (iii) Chipotle was experiencing a deceleration of growth as it was becoming a mature company.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(1) in that Plaintiff and defendants are citizens of different states and the matter in controversy exceeds the jurisdictional amount of $75,000, exclusive of interest and costs. In addition, this Court has supplemental jurisdiction under 28 U.S.C. §1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(1) because nominal defendant Chipotle is headquartered in this District. In addition, a portion of the occurrences complained of herein occurred in this District and one or more of the defendants either resides in, or maintains offices in, this District.

## PARTIES

12.     Plaintiff is a shareholder of Chipotle, was a shareholder of Chipotle at the time of the wrongdoing alleged herein, and has been a shareholder of Chipotle continuously since that time. Plaintiff is a citizen of New Hampshire.

13.     Nominal Defendant Chipotle is a Delaware corporation with its principal executive offices located at 1401 Wynkoop Street, Suite 500, Denver, Colorado. Chipotle develops and operates fast-casual, fresh Mexican food restaurants in the United States, Canada, the United Kingdom, and France. Its restaurants primarily offer burritos, tacos, burrito bowls, and salads. Chipotle is a citizen of Colorado and Delaware.

14.     Defendant Steve Ells ("Ells") founded Chipotle in 1993. Ells is co-Chief Executive Officer ("CEO") of Chipotle and has served as Chairman of the Board since 2005, and has served as a director of the Company since 1996. Ells is a citizen of New York.

15.     Defendant Montgomery F. Moran ("Moran") is Co-CEO of Chipotle and was appointed to this position on January 1, 2009 after serving as President and Chief Operating

Officer since March 2005.  Moran has also served as a director of the Company since 2006. Moran is a citizen of Colorado.

16.     Defendant John R. Hartung ("Hartung") has served as Chief Financial Officer ("CFO") of Chipotle since 2002.  Hartung is a citizen of Illinois.

17.     Defendant Albert S. Baldocchi ("Baldocchi") has served as a director of the Company since 1997 and was Chairman of the Audit Committee of the Board ("Audit Committee") at all times relevant hereto.  Baldocchi is a citizen of Colorado.

18.     Defendant John S. Charlesworth ("Charlesworth") has served as a director of the Company since 1999 and was a member of the Audit Committee at all times relevant hereto. Charlesworth is a citizen of North Carolina.

19.     Defendant Neil W. Flanzraich ("Flanzraich") has served as a director of the Company since 2007 and was a member of the Audit Committee at all times relevant hereto. Flanzraich is a citizen of Florida.

20.     Defendant Patrick J. Flynn ("Flynn") has served as a director of the Company since 1998 and a member of the Compensation Committee of the Board ("Compensation Committee") and Chairman of the Nominating and Corporate Governance Committee of the Board ("Nominating Committee") at all times relevant hereto.  Flynn is a citizen of Florida.

21.      Defendant Darlene J. Friedman ("Friedman") has served as a director of the Company since 1995 and Chairwoman of the Compensation Committee of the Board and a member of the Nominating Committee at all times relevant hereto.  Friedman is a citizen of California.

22.     Defendants Ells, Moran, Hartung, Baldocchi, Charlesworth, Flanzraich, Flynn and Friedman are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

23.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. As directors/or officers of a publicly held company, the Individual Defendants had a duty to properly disseminate all material information, in an accurate and truthful manner.

24.     Defendants, because of their positions of control and authority as directors and/or officers of Chipotle, were able to and did, directly and/or indirectly, exercise control over the wrongful acts detailed herein.  Because of their executive positions and/or access to Chipotle's internal information, defendants knew or should have known that Chipotle was violating the federal immigration laws relating to employee work authorizations, and violating the federal securities laws by making false statement about the Company's business and prospects.  Because defendants acted disloyally, they are not immune from liability under the business judgment rule and may not be indemnified by the Company for their faithless and unlawful acts.

25.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

26.     To discharge their duties, the Individual Defendants, as officers and directors of the Company, are required to exercise prudent and reasonable supervision over the management, policies, practices, and controls of the Company.   By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     properly and accurately guide investors and analysts regarding the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(b)     manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

(c)     neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

(d)     establish and maintain systematic and accurate records and reports of the business and operations of the Company and procedures for the reporting of the business and operations to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

       (f)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

       (g)      remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

       27.     Moreover, Chipotle maintains a Code of Business Conduct (the "Code"), which pertains to Chipotle's "employees, Officers, and all members of the Board of Directors."  The purpose of the Code is to ensure that "Chipotle is committed to the highest standards of integrity in all of [its] activities and compliance with both the letter and spirit of the law." The Code states in relevant part:

### Communicating with the Public
Whenever Chipotle communicates with the public, including the media and government agencies, accuracy and thoroughness are critical…. Public statements should be sufficiently candid, clear, and complete so that they neither mislead nor lend themselves to misinterpretation.

\*    \*    \*

### Recording and Reporting Information
Chipotle maintains a system of internal controls that we believe provides reasonable assurance that transactions are executed in accordance with management's authorization and are properly recorded. The system is characterized by a control-oriented environment that includes written policies and procedures. All employees are expected to adhere strictly to these policies.

Our records are critical in meeting our financial, legal, and business obligations. All records, including employment, payroll and financial data, checks and payments, as well as other essential data, must therefore be prepared with accuracy and care.  Dishonesty or carelessness in recording or reporting information, either inside or outside the Company, is not only strictly prohibited, but could lead to civil and criminal liability for you and for Chipotle.

Following are important guidelines to adhere to:

- All books and financial records must be kept in such a way as to fully and accurately reflect, in reasonable detail, all receipts, expenditures, transactions, assets, and liabilities in conformity with Chipotle's internal controls and generally accepted accounting principles.

- No false or artificial information may be recorded for any reason.

- Employees are prohibited from making false or misleading statements in connection with any audit or examination of Chipotle's financial statements and records, business operations, or for compliance with laws or regulations.

28.   Additionally, defendants Ells and Moran as Co-CEOs of Chipotle are obligated to comply with Chipotle's Code of Ethics for Co-CEO.  The Code of Ethics for Co-CEO states in relevant part:

As the Co-Chief Executive Officer of Chipotle Mexican Grill, Inc. (the "Company"), I acknowledge that the Company is committed to honesty and ethical conduct in all areas of its business and that officers with responsibility for the conduct or supervision of the Company's financial affairs play a special role in preserving and protecting shareholders' interests.

In furtherance of the above and to the best of my ability, I will adhere to the following principles and responsibilities:

- Act at all times in accordance with this Code of Ethics and the Company's Code of Business Conduct, a copy of which has been provided to me;

\* \* \*

- Provide, in the Company's reports filed with the Securities and Exchange Commission and other public communications, disclosure that is full, fair, accurate, complete, objective, timely and understandable;

- Comply with rules and regulations of all U.S. and non-U.S. governmental entities and other private and public regulatory agencies to which the Company is subject, including any exchanges on which the Company's securities may be listed;

- Act in good faith, responsibly, with due care, competence and diligence, and without misrepresenting material facts or circumstances;

- Act in what I reasonably and independently believe to be in the best interests of the Company;

\* \* \*

- Promote ethical behavior among employees under my supervision;

- Accept accountability for adherence to this Code of Ethics and the Company's Code of Business Conduct; and

- Achieve responsible use of and control over all assets and resources of the Company entrusted to me.

I acknowledge that the Company's Code of Business Conduct describe procedures for the internal reporting of violations of such Code. I will comply with those reporting requirements. I will also promote compliance with them by others under my supervision, as well as prompt reporting by them of violations of such Code. I further acknowledge that the consequences of my failure to adhere to this Code of Ethics or the Company's Code of Business Conduct may result in disciplinary action, up to and including termination for cause.

29.     Defendants Ells and Moran both signed the Code of Ethics for Co-CEO on

February 17, 2009, and thus, Ells and Moran were required to abide by the Code of Ethics for

Co-CEO at all relevant times hereto.

30.     Similarly, defendant Hartung as CFO of Chipotle is obligated to comply with

Chipotle's Code of Ethics for CFO.  The Code of Ethics for CFO states in relevant part:

As the Chief Financial Officer of Chipotle Mexican Grill, Inc. (the "Company"), I acknowledge that the Company is committed to honesty and ethical conduct in all areas of its business and that officers with responsibility for the conduct or supervision of the Company's financial affairs play a special role in preserving and protecting shareholders' interests.

In furtherance of the above and to the best of my ability, I will adhere to the following principles and responsibilities:

- Act at all times in accordance with this Code of Ethics and the Company's Code of Business Conduct, a copy of which has been provided to me;

\* \* \*

- Provide, in the Company's reports filed with the Securities and Exchange Commission and other public communications, disclosure that is full, fair, accurate, complete, objective, timely and understandable;

- Comply with rules and regulations of all U.S. and non-U.S. governmental entities and other private and public regulatory agencies to which the Company is subject, including any exchanges on which the Company's securities may be listed;

- Act in good faith, responsibly, with due care, competence and diligence, and without misrepresenting material facts or circumstances;

- Act in what I reasonably and independently believe to be in the best interests of the Company;

* * *

- Promote ethical behavior among employees under my supervision;

- Accept accountability for adherence to this Code of Ethics and the Company's Code of Business Conduct; and

- Achieve responsible use of and control over all assets and resources of the Company entrusted to me.

I acknowledge that the Company's Code of Business Conduct describe procedures for the internal reporting of violations of such Code. I will comply with those reporting requirements. I will also promote compliance with them by others under my supervision, as well as prompt reporting by them of violations of such Code. I further acknowledge that the consequences of my failure to adhere to this Code of Ethics or the Company's Code of Business Conduct may result in disciplinary action, up to and including termination for cause.

31. Defendant Hartung signed the Code of Ethics for CFO on December 3, 2008, and thus, Hartung was required to abide by the Code of Ethics for CFO at all relevant times hereto.

32. Finally, the Company's Audit Committee Charter specifically provides that the members of the Audit Committee - defendants Baldocchi, Charlesworth, and Flanzraich - shall "assist the Board in fulfilling its oversight responsibility relating to (i) the integrity of the Company's financial statements and its internal control system (including the implementation and effectiveness of internal control over financial reporting); (ii) the performance of the internal audit services function;… (iv) the compliance by the Company with legal and regulatory

requirements;… [and] (v) the implementation and effectiveness of the Company's disclosure controls and procedures."

33.     To that end, the Audit Committee's primary responsibilities and duties include, among other things, to:

> ***Oversight of Internal Control over Financial Reporting***. The Committee shall review with management and the independent auditors the Company's overall system of internal control, including management's annual assessment of the Company's internal control over financial reporting and the related report issued by the independent auditors. The Committee shall also review with management and the independent auditors: (i) significant deficiencies and material weaknesses in the design or operation of the Company's internal control over financial reporting; (ii) any fraud (regardless of materiality) involving management or other employees having a significant role in internal control over financial reporting; and (iii) changes in the Company's internal control over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, such internal control over financial reporting.

> ***Review of Disclosure Controls and Procedures***. The Committee shall review with the Chief Executive Officer, the Chief Financial Officer and the General Counsel the Company's disclosure controls and procedures and shall review periodically, but in no event less frequently than quarterly, management's conclusions about the effectiveness of such disclosure controls and procedures, including any material non-compliance with them.

> ***Review of Annual SEC Filings***. The Committee shall review with management and the independent auditors the financial information to be included in the Company's Annual Report on Form 10-K (or the annual report to shareholders if distributed prior to the filing of the Form 10-K), including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," their judgment about the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments made in the preparation of the financial statements and the clarity of the disclosures therein. The Committee shall also discuss the results of the annual audit and any other matters required to be communicated to the Committee by the independent auditors under applicable standards of the PCAOB (United States) or applicable law or listing standards. The Committee may discuss with the national office of the independent auditors issues on which it was consulted by the Company's audit team and matters of audit quality and consistency. Based on such review and discussion, the Committee shall determine whether to recommend to the Board that the audited financial statements be included in the Company's Form 10-K.

> ***Review of Quarterly SEC Filings***. The Committee shall review and discuss with management and the independent auditors the quarterly financial information to

be included in the Company's Quarterly Reports on Form 10-Q, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and shall discuss any other matters required to be communicated to the Committee by the independent auditors under applicable standards of the PCAOB (United States) or applicable law or listing standards. The Committee shall also discuss the results of the independent auditors' review of the Company's quarterly financial information conducted in accordance with applicable standards of the PCAOB (United States).

**Review of Certain Other Communications**. The Committee shall review the Company's earnings press releases and financial information and earnings guidance, including non-GAAP financial measures, periodically provided to analysts and rating agencies (which may consist of a discussion of the types of information to be provided and types of presentation to be made) to the extent required by applicable law or listing standards.

**Review of Certain Matters with Management and the Independent Auditors.** The Committee shall review periodically with management and independent auditors (i) significant financial reporting issues, including material changes in the Company's selection or application of accounting principles and the effects of alternative applications of accounting principles on the Company's financial statements; and (ii) the effect of new or proposed regulatory and accounting initiatives on the Company's financial statements and other public disclosures.

\* \* \*

**Oversight of Compliance and Ethics Program**. The Committee shall periodically, but not less frequently than annually, review with management, including the General Counsel, the implementation and effectiveness of the Company's compliance and ethics program, including the "whistleblowing" procedures referred to above. In performing such oversight, the Committee shall also review with appropriate members of management, including the head of internal audit (or service providers) and, if appropriate, the independent auditors any correspondence with, or other action by, regulators or governmental agencies and any employee complaints or published reports that raise concerns regarding the Company's financial statements, accounting or auditing matters or compliance with the Company's Code of Business Conduct and Ethics or other applicable law or listing standards. The Committee shall also meet periodically with the chief legal officer to review the material legal affairs of the Company.

**Review of Certain Transactions with Directors and Related Parties.** The Committee shall review periodically, but no less frequently than annually, a summary of the Company's transactions with Directors and officers of the Company and with firms that employ Directors, as well as any other material related party transactions.

## CHIPOTLE'S IMMIGRATION VIOLATIONS

34.     Chipotle employs nearly 32,000 people at restaurants located throughout the United States.  Because of its status as a U.S.-based employer, Chipotle is subject to a number of federal immigration laws, including the Immigration Reform and Control Act.  First enacted by Congress in 1986, the Immigration Reform and Control Act prohibits employers from employing illegal immigrants and other undocumented workers.  Therefore, under the Immigration Reform and Control Act, all covered companies, like Chipotle, must document each employee's identity and work eligibility of on a Form I-9 within three days of hire.  Otherwise, the employer can be held liable for civil and/or criminal fines and penalties for employing illegal, undocumented workers.

35.     Despite defendants' knowledge of the Immigration Reform and Control Act, Chipotle repeatedly violated the Act's provisions by employing hundreds of undocumented workers at its restaurants located in the United States.  For example, in 2010, a federal audit of Chipotle's work authorization documents for its employees in Minnesota uncovered a substantial number of employees who appeared not to be authorized to work in the United States.  Following the issuance of a Notice of Suspect Documents by ICE, an arm of the U.S. Department of Homeland Security, primarily responsible for enforcement of the Immigration Reform and Control Act, Chipotle approached the suspect employees and allowed each to confirm the validity of their work eligibility documents, or provide valid work eligibility documents.  Numerous employees were unable to provide valid work eligibility documents and, as a result, Chipotle fired approximately 450 employees in Minnesota, resulting in work disruptions and increased labor costs.

36.     In late 2010, ICE began a similar audit of Chipotle's work authorization documentation for its employees in Virginia and the District of Columbia.  As a result of this audit, Chipotle fired an additional fifty employees.  And, as with the Minnesota firing, work disruptions and increased labor costs ensued.

37.     ICE's investigation into Chipotle's work authorization documentation is ongoing.  Indeed, since the Virginia and District of Columbia audits, Chipotle has received several additional requests for work authorization documentation at other Chipotle restaurants.

38.     Worse yet, on May 18, 2012, the Company announced that the SEC had opened a formal investigation into the Company and had served a subpoena requesting documents relating to Chipotle's compliance with work authorization laws, public disclosures, and related matters.  Then, a few days later, on May 22, 2012, Chipotle revealed that it had been notified that the United States District Attorney for the District of Columbia had opened a separate investigation into the Company for possible criminal violations arising from Chipotle's failure to comply with federal employee work authorization laws, as well as its public disclosures.

39.     Moreover, defendants were fully aware that Chipotle's employment of hundreds, if not thousands of workers triggered significant compliance obligations and risks under the federal immigration laws, including the Immigration Reform and Control Act.  Defendants' own statements, in Chipotle's shareholder reports make this abundantly clear.  For example, in Chipotle's 2009 Annual Report on SEC Form 10-K, dated February 19, 2010, defendants acknowledged the risk of loss arising from the Company hiring undocumented workers, stating:

> Labor is a primary component of our operating costs, and we believe good managers and crew are a key part of our success.  We devote significant resources to recruiting and training our restaurant managers and crew.

* * *

Various states in which we operate are considering or have already adopted new immigration laws, and the U.S. Congress and Department of Homeland Security from time to time consider or implement changes to Federal immigration laws, regulations or enforcement programs as well. Some of these changes may increase our obligations for compliance and oversight, which could subject us to additional costs and make our hiring process more cumbersome, or reduce the availability of potential employees. In addition, we have been subject to audits by immigration authorities from time to time. Although we require all workers to provide us with government-specified documentation evidencing their employment eligibility, some of our employees may, without our knowledge, be unauthorized workers. Unauthorized workers are subject to deportation and may subject us to fines or penalties, and if any of our workers are found to be unauthorized we could experience adverse publicity that negatively impacts our brand and may make it more difficult to hire and keep qualified employees. If a significant number of unauthorized workers is identified in a particular market or across our company, the resulting disruption to our operations could be significant and our financial performance could be materially harmed as a result.

40.     Similarly, in Chipotle's 2010 Annual Report on SEC Form 10-K, dated February

17, 2011, defendants stated:

We are also subject to various federal and state laws governing our relationship with and other matters pertaining to our employees, including wage and hour laws, requirements to provide meal and rest periods or other benefits, family leave mandates, requirements regarding working conditions and accommodations to certain employees, citizenship or work authorization and related requirements, insurance and workers' compensation rules and anti-discrimination laws. Complying with these rules subjects us to substantial expense and can be cumbersome, and can also expose us to liabilities from claims for non-compliance.... Unauthorized workers are subject to deportation and may subject us to fines or penalties, and if any of our workers are found to be unauthorized our business may be disrupted as we try to replace lost workers with additional qualified employees.  We could also experience adverse publicity arising from immigration-related enforcement activity that negatively impacts our brand and may make it more difficult to hire and keep qualified employees.

41.     And, further still, in Chipotle's 2011 Annual Report on SEC Form 10-K, dated

February 10, 2012, defendants re-affirmed the potential risks of loss to the Company arising

from violations of federal immigration laws, stating:

…Our success also depends in part on the energy and skills of our employees and our ability to hire, motivate and keep qualified employees, especially restaurant managers and crew members.  Our failure to find and keep enough employees who are a good fit with our culture could delay planned restaurant openings, result

in higher employee turnover or require us to change our culture, any of which could have a material adverse effect on our business and results of operations.

Various states in which we operate are considering or have already adopted new immigration laws, and the U.S. Congress and Department of Homeland Security from time to time consider or implement changes to Federal immigration laws, regulations or enforcement programs as well.  Some of these changes may increase our obligations for compliance and oversight, which could subject us to additional costs and make our hiring process more cumbersome, or reduce the availability of potential employees.  Although we require all workers to provide us with government-specified documentation evidencing their employment eligibility, some of our employees may, without our knowledge, be unauthorized workers.  This may subject us to fines or penalties, and we could experience adverse publicity that negatively impacts our brand and may make it more difficult to hire and keep qualified employees.  For example, following an audit by the Department of Homeland Security of the work authorization documents of our restaurant employees in Minnesota during 2010, we lost approximately 450 employees, resulting in a temporary increase in labor costs and disruption of our operations, including slower throughput, as we trained new employees, as well as some degree of negative publicity.  We are currently undergoing a similar audit in Virginia and the District of Columbia, and in April 2011 we received notice from the office of the United States Attorney for the District of Columbia that it is conducting an investigation into these matters through its criminal division. Termination of a significant number of employees in those or other markets or across our company will disrupt our operations including slowing our throughput, and may also cause additional adverse publicity and temporary increases in our labor costs as we train new employees.  Our financial performance could be materially harmed as a result of any of these factors.

\* \* \*

We are also subject to various federal and state laws governing our relationship with and other matters pertaining to our employees, including wage and hour laws, requirements to provide meal and rest periods or other benefits, family leave mandates, requirements regarding working conditions and accommodations to certain employees, citizenship or work authorization and related requirements, insurance and workers' compensation rules and anti-discrimination laws. Complying with these rules subjects us to substantial expense and can be cumbersome, and can also expose us to liabilities from claims for non-compliance....  We also are audited from time to time for compliance with citizenship or work authorization requirements as well, and recent audit activity in this area is described in more detail above under "***Our business could be adversely affected by increased labor costs or difficulties in finding the right employees for our restaurants***."  Unauthorized workers may subject us to fines or penalties, and if any of our workers are found to be unauthorized our business may be disrupted as we try to replace lost workers with additional qualified employees.  We could also experience adverse publicity arising from

immigration-related enforcement activity that negatively impacts our brand and may make it more difficult to hire and keep qualified employees.

42.     For years, Chipotle's SEC filings detail that the Individual Defendants were aware of the risks associated with violations of federal employee work authorization laws. The Individual Defendants, however, consciously disregarded the duty to comply with those laws.

## IMPROPER STATEMENTS

43.     In addition to the violations concerning the Company's employment practices, during the time complained of, the Individual Defendants knowingly or recklessly caused the Company to issue false and misleading statements about the Company's business and prospects.

44.     In breach of both their fiduciary duty of good faith and, with respect to the members of the Audit Committee (defendants Baldocchi, Charlesworth, and Flanzraich), their fiduciary responsibilities as members of the Audit Committee, the Individual Defendants willfully ignored the obvious and pervasive problems with the Company's financial statements, its accounting practices, and its lack of adequate internal and financial controls, and failed to make a good faith effort to correct the problems or prevent their recurrence.

45.     Since Chipotle became public in 2006, it has long been a darling of analysts and investors due to its rapid growth and sales trends that defied the malaise in the U.S. economy. Chipotle's financial success relies on diners' willingness to pay premium prices for its food made with organic produce and antibiotic-free meats, and Chipotle has long said that its customers will pay a higher price for its fresh, sustainable, and higher-quality food, even during a downturn.

**The Individual Defendants Cause Chipotle to Make False and Misleading Statements**

46.     On February 1, 2012, defendants Ells, Moran, and Hartung, with the knowledge and explicit approval of defendants Baldocchi, Charlesworth, and Flanzraich, caused the

Company to issue a press release announcing results for its 2011 fourth quarter and full year ended December 31, 2011, which stated in relevant part:

> "During 2011, we remained focused on our mission to change the way the world thinks about and eats fast food, while continuing to strengthen our people culture and our unit economic model. Our success is rooted in serving great tasting food and it has been since day one. Our sourcing of food made from the finest ingredients, which is raised with respect for the animals, the environment, and the farmers is at the heart of that effort," said Steve Ells, Founder, Chairman and Co-CEO of Chipotle.
>
> *   *   *
>
> "Our accomplishments this year were truly amazing. Empowered cultures create excellent teams. These excellent teams are exciting, productive and powerful. They attract great employees and develop them to be at their very best, and they become the future leaders within our organization," commented Co-CEO Monty Moran.

47.     That same day, after releasing its 2011 fourth quarter and full-year 2011 results, Chipotle hosted a conference call for analysts, media representatives, and investors in which defendant Hartung stated the following:

> Our financial results continue to be driven by a focus on strengthening our food culture, our people culture, and our business model. And while we're pleased with these financial results, we're even more pleased with the strong position we are in as we look to the future, both in 2012 and beyond. We're proud to report our sixth consecutive quarter of double-digit comps since the economy began to recover, with a comp of 11.1% in the quarter. Our average restaurant sales now exceed $2 million for the first time.

48.     On April 19, 2012, defendants Ells, Moran, and Hartung, with the knowledge and explicit approval of defendants Baldocchi, Charlesworth, and Flanzraich, caused the Company to issue a press release announcing results for its 2012 first quarter ended March 31, 2012.  The Company's reported revenue for the first quarter of 2012 was $640.6 million and net income was $62.7 million, or $1.97 per diluted share.  The press release stated in relevant part:

> Our strong people culture continues to drive our success in attracting loyal customers and delivering exceptional results. Our restaurant teams are ambitious, passionate, and dedicated to delivering the best dining experience possible. Our

efforts to hire and develop top performing crews will continue to lead to stronger future leaders running our restaurants, and ensure our customers will enjoy the best customer service possible.

49.    That same day, after releasing its results for the 2012 first quarter ended March

31, 2012, Chipotle hosted a conference call for analysts, media representatives, and investors in

which defendants Ells and Hartung stated the following:

[ELLS]: Thank you, Alex. We are pleased to see our momentum from 2011 carry into the first quarter of 2012. Coming out of the recession we have now seen seven consecutive quarters of double-digit same-store sales growth, posting a comp sales increase of 12.7% in the first quarter on revenue of $640.6 million, an increase of 25.8% from the first quarter of 2011, adding up to earnings per share of $1.97 for the quarter.

\* \* \*

[HARTUNG]: We are pleased to report the seventh consecutive quarter of double-digit sales comps since the economy began to recover, with a comp of 12.7%. These strong comps along with new restaurant openings drove a sales increase of 25.8% to $640.6 million in the quarter. The comp was driven mostly from increased traffic while higher menu prices added about 4.9%.

In March we raised prices in our Pacific region by about 4.5% to reflect the higher cost of doing business in the region and to help narrow the pricing gap with other US markets. This price increase was completed in March. And because it laps a similar increase in the Pacific region at about the same time last year, it will have no additive effect to our comps going forward.

While we continue to believe we have pricing power, we do not have plans for any additional menu price increases during 2012 to offset expected food inflation. Our business model is strong and we are not compelled to take short-term price increases to drive quarterly results, and instead we are focused on driving greater customer loyalty and strong transaction trends.

50.    On May 23, 2012, defendants Moran and Hartung attended the Morgan Stanley

Retail Conference for analysts and investors during which these defendants stated the following:

[MORAN]: But our margins in the first quarter were the highest they've been for that first quarter. Our transaction trends are quite strong. And we would rather not be in a hurry to raise prices because if we had raise prices right now it would in essence be to boost our margins right now. Don't need to boost our margins right now. We don't have the food of integrity story that we like to raise prices and say,

but, look at what we've done with the food and everybody can enjoy these higher-quality ingredients.

So we're going to be very patient. So we don't have any plans now this year. We'd rather continue to see momentum with our transaction growth. We'd rather continue to see what the economy does. The economy seems to be in pretty good footing, but every day, you wake up and there's news that will either cause people to be more confident or less confident. And let's see what the competitors do to.

To the extent that there is any inflation whatsoever other competitors who don't have the margins that we have and do have franchisees are going to be a little bit more impatient than we might be. Let's see what they do with their menu price. Let's see how the customers respond. And then we can be in a position of strength and see how that plays out, and maybe sometime next year consider what we might do with pricing.

\* \* \*

[HARTUNG]: You know there's nobody doing exactly what we are doing. There is other restaurants that are serving burritos, and so those are certainly customers; you've got Qdoba; you've got Baja Fresh; here, you've got Boloco and Anna's, some of the locals.

But we think the competition is probably broader than that. We think it probably includes other fast casual like Panera's and maybe Pot Belly's and places like that.

But we don't find that competition takes business away from us. We find that when we establish ourselves and we build customer loyalty within a market, if somebody opens right next door to us we might see our customers, we might see our traffic decline for a little bit, for a very short period of time, maybe a couple weeks. And within two, three, four weeks, our business is right back. So we don't see that anybody is taking customers away and then keeping them.

51.     On June 5, 2012, defendants Ells and Hartung attended the Goldman Sachs

Lodging, Gaming, Restaurant and Leisure Conference for analysts and investors during which

defendant Hartung stated the following:

[HARTUNG]: Thanks, Steve. Just briefly recapping our first-quarter results we reported in April, our revenue grew almost 26% in the first quarter compared to last year, as you can't see on the screen anymore. That was driven by comps of 12.7%, and that is our seventh consecutive quarter of double-digit comps since the recession ended. And for those who have followed us for a while, you will know before the recession we had 10 straight years of double-digit comps, and they were only interrupted by the recession. So we are pleased to see that as the economy began to recover, as our customers began to come to Chipotle more

often, we are back on this track of double-digit comps with seven quarters in a row now.

52. On June 14, 2012, defendants Ells, Moran, and Hartung attended the William Blair and Co. LLC Growth Stock Conference for analysts and investors during which defendant Hartung stated the following:

> [HARTUNG]: Our comps during the quarter were 12.7%. This is the seventh straight quarter that we've had of double-digit comps since the recession ended.
>
> For those who have followed Chipotle for a while, you will remember that we actually had 10 straight years of double-digit comps that were only interrupted by the recession. So our comps did slip to low single digits during the recession, but we were pleased to see that when the recession began to subside our customers began to visit Chipotle more often, and our comps fairly quickly returned back to double digits. And we've got seven quarters in a row now of double-digit comps.
>
> *   *   *
>
> They have grown every single year except for 2009, and that was only slowed, as I mentioned before, by the recession, where our comps instead of double-digit comps were in the low single-digit range. So we are pleased to see that we have returned to increasing our average volume every single year.

### THE TRUTH IS REVEALED

53. On July 19, 2012, the truth about the Company's business outlook was revealed when the Company issued a press release announcing the disappointing results for its 2012 second quarter ended June 30, 2012, and weak guidance for the rest of the year. The press release revealed the true position of Chipotle, reporting revenue for the second quarter of 2012 was $690.9 million and net income was $81.7 million, or $2.56 per diluted share. The press release stated in relevant part:

> Revenue for the quarter was $690.9 million, up 20.9% from the prior year period. The growth in revenue was the result of new restaurants not in the comparable base and an 8.0% increase in comparable restaurant sales. Comparable restaurant sales growth was primarily driven by the impact of menu price increases, most of which were taken in 2011, as well as from increased traffic.

54.     In response to these shocking revelations, Chipotle's market capitalization value plummeted from $12.8 billion at close on July 19, 2012 to $10 billion on July 20, 2012, a decrease of $2.8 billion, or 22%.

## REASONS THE STATEMENTS WERE IMPROPER

55.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     Chipotle did not have the pricing power to implement price increases sufficient to offset rising food costs and, as a result, the Company's margins would be under pressure as Chipotle would be unable to pass these commodities costs off to the customers;

(b)     demand for Chipotle was slow and could not support the Company's aggressive 2012 earnings forecasts, particularly that customer traffic at Chipotle stores had begun to slow due to the economy and increased competition; and

(c)     Chipotle was experiencing a deceleration of growth as it was becoming a mature company.

## DEFENDANTS ELLS, MORAN, AND HARTUNG'S EXCESSIVE COMPENSATION

56.     It is not surprising, however, that the Individual Defendants made improper statements to the public regarding Chipotle's financial condition during the time complained of considering that certain of the Individual Defendants have to justify their compensation packages. Due to Chipotle portraying itself as a high-growth company, executive pay to defendants Ells, Moran, and Hartung has exponentially increased as illustrated in the following table:

| Officer | 2009 | 2010 | 2011 |
|---------|------|------|------|
| Ells | $6,414,698 | $14,095,870 | $19,391,571 |
| Moran | $5,554,237 | $13,449,506 | $18,759,728 |
| Hartung | $2,410,821 | $5,620,539 | $6,656,004 |

57.    On April 4, 2012, during the midst of the wrongdoing, Chipotle filed its Proxy Statement with the SEC in which the Company revealed the enormous compensation packages awarded to defendants Ells, Moran, and Hartung for fiscal year 2011.  In particular, Ells' total compensation skyrocketed 37.6% from 2010 resulting in *Forbes* magazine now listing Ells as one of the country's highest-paid CEOs.  Similarly, defendant Moran saw his total compensation rise by 39.5% from 2010 and defendant Hartung's total compensation increased by 18.4%.  As a result, management has rewarded themselves based on Chipotle's representations of high-growth and superior pricing power and Chipotle shareholders are left with the burden of the Individual Defendants' mismanagement of the Company.

### INSIDER SALES

58.    Throughout the period of wrongdoing alleged in the Complaint, defendants Baldocchi and Moran (the "Insider Selling Defendants") each sold significant amounts of their personally-held shares of Chipotle at highly suspicious times.  The Insider Selling Defendants sold these shares while in possession of material, non-public information.  Specifically, the Insider Selling Defendants sold the following shares:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|-------------------|------------------|--------|-------|----------|
| **BALDOCCHI** | 2/3/2012 | 4,675 | $368.84 | $1,724,327.00 |
| | 2/3/2012 | 4,925 | $370.05 | $1,822,496.25 |
| | 2/3/2012 | 400 | $370.53 | $148,212.00 |
| | | **10,000** | | **$3,695,035.25** |
| | | | | |
| **MORAN** | 2/17/2012 | 603 | $380.00 | $229,140.00 |
| | 2/17/2012 | 8,000 | $382.58 | $3,060,640.00 |
| | 2/23/2012 | 3,603 | $384.31 | $1,384,668.93 |
| | 2/23/2012 | 12,815 | $385.33 | $4,938,003.95 |

| | | | |
|---|---|---|---|
| | 2/23/2012 | 809 | $385.87 | $312,168.83 |
| | 2/24/2012 | 8,900 | $385.04 | $3,426,856.00 |
| | 2/24/2012 | 7,440 | $385.60 | $2,868,864.00 |
| | 2/24/2012 | 900 | $387.08 | $348,372.00 |
| | 2/29/2012 | 7,074 | $388.11 | $2,745,490.14 |
| | 2/29/2012 | 4,258 | $388.88 | $1,655,851.04 |
| | 2/29/2012 | 4,845 | $390.00 | $1,889,550.00 |
| | 2/29/2012 | 1,100 | $391.00 | $430,100.00 |
| | | **60,347** | | **$23,289,704.89** |
| | | | | |
| | | **70,347** | | **$26,984,740.14** |

59. The Insider Selling Defendants' stock sales were suspicious in timing as they all came within four weeks of each other. Defendant Baldocchi's sales were made only two days after the first improper statement alleged herein. Moran's sales came only weeks later and before the truth about Chipotle's financial condition was finally revealed.

## DAMAGES TO CHIPOTLE

60. As a result of the Individual Defendants' improprieties, Chipotle disseminated improper, public statements concerning its guidance and future business prospects. These improper statements have devastated Chipotle's credibility as reflected by the Company's $2.8 billion, or 22%, market capitalization loss.

61. Further, as a direct and proximate result of the Individual Defendants' actions, Chipotle has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b)     costs incurred from responding to investigations related to the federal immigration law violations;

(c)     costs incurred from paying fines and penalties related to the federal immigration law violations;

(d)     operational costs from hiring new employees and verifying current employees' documentation;

(e)     costs and lost business incurred from work disruptions due to firing of employees; and

(f)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Chipotle.

62.     Moreover, these actions have irreparably damaged Chipotle's corporate image and goodwill.  For at least the foreseeable future, Chipotle will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Chipotle's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

63.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

64.     Plaintiff is a shareholder of Chipotle, was a shareholder of Chipotle  at the time of the wrongdoing alleged herein, and has been a shareholder of Chipotle continuously since that time.

65.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

66.     The current Board of Chipotle consists of seven directors: defendants Moran, Ells, Baldocchi, Friedman, Flynn, Charlesworth, and Flanzraich.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

67.     As alleged above, defendants Ells, Moran, Baldocchi, Charlesworth, Flanzraich, Flynn, and Friedman breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding the Company's business outlook. Accordingly, demand is futile as to Ells, Moran, Baldocchi, Charlesworth, Flanzraich, Flynn, and Friedman.

68.     The principal professional occupation of defendant Ells is his employment with Chipotle, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Accordingly, Ells lacks independence from defendants Moran, Baldocchi, Charlesworth, Flanzraich, Flynn, and Friedman due to his interest in maintaining his executive position at Chipotle. This lack of independence renders Ells incapable of impartially considering a demand to commence and vigorously prosecute this action. Thus, demand is futile as to Ells.

69.     The principal professional occupation of defendant Moran is his employment with Chipotle, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Accordingly, Moran lacks independence from defendants Ells, Baldocchi, Charlesworth, Flanzraich, Flynn, and Friedman due to his interest in maintaining his executive position at Chipotle. This lack of independence renders Moran incapable of impartially considering a demand to commence and vigorously prosecute this action. Thus, demand is futile as to Moran.

70.     Defendants Baldocchi, Charlesworth, and Flanzraich, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, Baldocchi, Charlesworth, and Flanzraich were responsible for

knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and business outlook.  Moreover, Baldocchi, Charlesworth, and Flanzraich reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, Baldocchi, Charlesworth, and Flanzraich caused these improper statements. Accordingly, Baldocchi, Charlesworth, and Flanzraich breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, Baldocchi, Charlesworth, and Flanzraich face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

71.    Demand is futile as to defendants Baldocchi, Charlesworth, and Flanzraich because as members of the Audit Committee, they approve all related party transactions pursuant to the Audit Committee Charter.  During 2010, defendant Ells caused the Company to be the prize sponsor for the network television program "America's Next Great Restaurant" and in connection therewith, Chipotle made cash contributions totaling $2.3 million to ANGR Holdings, LLC, the entity that will operate the restaurants to be awarded as a prize on the program, in exchange for an equity interest in the entity. Ells also caused Chipotle to agree to provide a variety of corporate and administrative services to the entity in connection with its operations.  Ells serves as a judge on the America's Next Great Restaurant program, and as part of the terms of his involvement with the program, is a co-investor in ANGR Holdings. In June 2011, Chipotle purchased Ells' interest in ANGR Holdings for $220,000, the amount of the cash contribution originally made by Ells. Baldocchi, Charlesworth, and Flanzraich approved this related party transaction which allows Ells to receive back the money that he invested in the show's concept, even though it is still is financially uncertain whether the investment pays off for Chipotle.  That these directors caused Chipotle to enter into this related party transaction that

clearly benefits Ells over the interests of Chipotle's shareholders, demonstrates these directors' utter lack of independence from Ells.

72.     Defendants Baldocchi and Moran benefited from the artificial inflation of the Company's stock price by selling their personally held stock on the basis of their knowledge of non-public information concerning the Company.  Baldocchi and Moran sold over $3.6 million and $23.2 million worth of their personally held stock, respectively.  These sales were suspicious in timings and amount, as explained here.  Trading on the basis of inside information is a non-exculpated breach of a fiduciary's duty of loyalty.  Accordingly, there is a reason to doubt Baldocchi and Moran's ability to disinterestedly consider a demand, excusing a demand.

73.     Demand is futile as to defendants Flynn and Charlesworth because they are long-time associates with one another, having previously worked at McDonalds Corporation. Chipotle separated from McDonalds in October 2006. Flynn spent thirty-nine years at McDonalds and Charlesworth spent twenty-six years at McDonalds.   Both Flynn and Charlesworth worked as Vice Presidents at McDonalds dealing with strategic planning.  Flynn and Charlesworth's long standing association with one another prevent them from independently considering a demand against one another.

74.     Any suit by the current directors of Chipotle to remedy these wrongs would expose defendants Ells, Moran, and Hartung, and Chipotle to liability for violations of the federal securities laws in the pending securities class actions, and would result in civil actions being filed against one or more of the other Individual Defendants.  The securities class action alleges violations of sections 10(b) and 20(a) of the Exchange Act.  If the Board elects for the Company to press forward with its right of action against Ells, Moran, and Hartung in this action,

then Chipotle's efforts would compromise its defense of the securities class action. Accordingly, demand on the Board is excused.

75. Moreover, the acts complained of constitute violations of the fiduciary duties owed by Chipotle's officers and directors and these acts are incapable of ratification.

76. Each of the defendant directors of Chipotle authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein and thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

77. Chipotle has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Chipotle any part of the damages Chipotle suffered and will suffer thereby.

78. If Chipotle's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Chipotle. However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Chipotle against these defendants, known as the "insured versus insured exclusion." As a result, if these directors were to cause Chipotle to sue themselves or certain of the officers of Chipotle, there

would be no directors and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors and officers' liability insurance, then the current directors will not cause Chipotle to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

79.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Chipotle for any of the wrongdoing alleged by plaintiff herein.

80.     Plaintiff has not made any demand on the other shareholders of Chipotle to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Chipotle is a publicly held company with over 31.6 million shares outstanding and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force Plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

## AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES

81.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

82.     As alleged in detail herein, each of the Individual Defendants had a duty to, inter alia, exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and, when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

83.     As alleged herein, the Individual Defendants made false and misleading statements regarding the Company's business and prospects, and failed to make a good faith effort to correct the false statements or the underlying problems or prevent their recurrence.

84.     Further, defendants owed Chipotle a fiduciary duty of loyalty (and candor and good faith) that requires them to direct and operate Chipotle accordance with the laws applicable to its business and operations, including the federal immigration and federal securities laws. However, as detailed above, while under defendants' stewardship, Chipotle likely violated federal immigration work authorization laws, rules, and regulations on several occasions, in numerous states, as well as made allegedly false and misleading statements in violation of the federal securities laws.  Defendants' failure ensure that Chipotle's business and operations complied with federal immigration and securities laws was in breach of their fiduciary duty of loyalty.

85.     The Individual Defendants failed to ensure that management had in place a system of internal controls to ensure compliance with federal immigration and securities laws. Accordingly, the Individual Defendants completely and utterly failed in their duty of oversight.

86.     As a result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained damages, as alleged herein.

## COUNT II

## AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

87.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

88.     As a result of the false and misleading statements and federal immigration and law violations, the Company by failing to conduct proper supervision, the Individual Defendants have caused Chipotle to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

89.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

90.     Plaintiff, on behalf of Chipotle, has no adequate remedy at law.

## COUNT III

## AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

91.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

92.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Chipotle.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Chipotle.

93.     The Insider Selling Defendants sold Chipotle stock while in possession of material, adverse non-public information that artificially inflated the price of Chipotle stock.  As a result, Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

94.     Plaintiff, as a shareholder and representative of Chipotle, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

95.     Plaintiff, on behalf of Chipotle, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.      Directing Chipotle to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

(i)      a proposal to strengthen the Company's compliance with immigration and employment laws;

(ii)     a proposal to strengthen the Board's supervision of the accuracy and authenticity of the Company's public statements; and

(iii)      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

Dated: September 21, 2012

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
KEVIN A. SEELY
JAY N. RAZZOUK


s/Brian J. Robbins
BRIAN J. ROBBINS

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsumeda.com
kseely@robbinsumeda.com
jrazzouk@robbinsumeda.com

THE BRISCOE LAW FIRM, PLLC
WILLIE BRISCOE
8117 Preston Road, Suite 300
Dallas, TX  75225
Telephone: (214) 706-9314
Facsimile:  (214) 706-9315
wbriscoe@thebriscoelawfirm.com

POWERS TAYLOR LLP
PATRICK POWERS
8150 N. Central Expressway
Suite 1575
Dallas, TX 75206

Telephone: (214) 239-4565
Facsimile: (214) 550-2635
patrick@powerstaylor.com

<u>VERIFICATION</u>

I, Joanne Nelson, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Shareholder Derivative Complaint.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: ___9|20|12___

_____
JOANNE NELSON